IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Donzell Thomas | ) |
| | ) |
|    Plaintiff, | ) |
| | ) |
|  v. | )  No. 17 C 5936 |
| | ) |
| Gomez, et al., | ) |
| | ) |
|    Defendants. | ) |

MEMORANDUM OPINION AND ORDER

Donzell Thomas, an inmate at Stateville Correctional Center, complains in this action that prison medical staff were deliberately indifferent to his serious medical conditions of osteoarthritis and degenerative joint disease and that he was discriminated against in violation of the Rehabilitation Act of 1973.[1] According to the operative complaint, when Mr. Thomas arrived at Stateville in 2011, he received a "low bunk/low gallery permit" because of these preexisting medical conditions. Nevertheless, he was housed in higher galleries between sometime in 2012 until September of 2014. This

---

[1] Mr. Thomas originally asserted a number of other claims, but these are the ones that remain after resolution of various defendants' motions for dismiss. In addition, Mr. Thomas challenges other aspects of the medical treatment he has received at Stateville in two other cases before me: Case No. 18-cv-4311, which was recently dismissed pursuant to settlement, and Case No. 20 C 4564, which remains pending.

required him to walk up and down several flights of stairs, which took a toll on his leg. In early 2015, Mr. Thomas's left leg "gave out," causing him to fall.

Mr. Thomas claims that Dr. Saleh Obaisi, who was Stateville's Medical Director until his death in December of 2017, and one of its staff physicians, Dr. Alma Martija, are individually liable to him for damages under § 1983 for their deliberate indifference to the conditions described above. These defendants manifested their deliberate indifference, Mr. Thomas argues, when they misdiagnosed him with bursitis; denied him permits for "lay-in-tray" service, crutches, and waist restraints; continued to prescribe ineffective treatments for his pain; and failed to order knee replacement surgery prior to September of 2019.

Additionally, Mr. Thomas claims that John Baldwin, the director of the Illinois Department of Corrections, and David Gomez, the current warden of Stateville, each in their official capacities, are liable for discrimination in violation of the Rehabilitation Act for failing to ensure that he was housed in a lower gallery or to provide him with "lay-in-tray" meal service that would have allowed him to take meals in his cell and thus avoid using the stairs for meals. Mr. Thomas also claims that these defendants denied him the use of crutches to accommodate his disability.

In three separate motions, defendants have moved for summary judgment. For the reasons that follow, their motions are granted.

I.

"Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 963 (7th Cir. 2019). A genuine dispute as to a material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In resolving a motion for summary judgment, I "construe all facts and reasonable inferences in the light most favorable to the nonmoving party," but a mere "scintilla of evidence" supporting the non-movant's position does not suffice. *Id*. 477 U.S. at 248. Instead, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Id*. at 252.

Deliberate indifference to an incarcerated person's serious medical needs may constitute cruel and unusual punishment under the Eighth Amendment. *Campbell v. Kallas*, 936 F.3d 536, 544-45 (7th Cir. 2019) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). Importantly, deliberate indifference means something "more than mere negligence." *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001). To establish an Eighth Amendment violation, a prisoner must show that the prison's healthcare provider or other prison official "was subjectively aware of the prisoner's serious medical needs and disregarded an excessive risk that a lack of treatment posed" to the prisoner. *See Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970,

128 L. Ed. 2d 811 (1994) ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). Accordingly, to withstand summary judgment, the plaintiff must point to evidence from which a reasonable factfinder could conclude that he or she suffered from "(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008).

To prevail on a claim under the Rehabilitation Act, a plaintiff must establish that (1) he is a qualified person (2) with a disability and (3) the Department of Corrections denied him access to a program or activity because of his disability. *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012). "Refusing to make reasonable accommodations is tantamount to denying access; although the Rehabilitation Act does not expressly require accommodation, the Supreme Court has located a duty to accommodate in the statute generally." *Id.* (internal quotation marks and citation omitted).

II.

1. Dr. Martija's and Dr. Obaisi's motions

In separate motions, these defendants offer a host of substantive and procedural arguments for granting summary judgment in their favor on Mr. Thomas's Eighth Amendment claims against them. But because I conclude that no reasonable jury could infer, based on the record before me, that either defendant was deliberately indifferent

4

to Mr. Thomas's medical conditions, I grant their motions on this basis without reaching their remaining arguments.

### A. Dr. Martija

It is undisputed that Dr. Martija first saw Mr. Thomas on March 20, 2015, when he presented with an inability to bear weight on his left leg, accompanied by swelling and warmth in his left thigh. After taking Mr. Thomas's medical history and conducting a physical examination, Dr. Martija assessed bursitis based on the appearance of the joint, and she prescribed ice, Tylenol, and the use of a crutch. Mr. Thomas testified that he requested a lay-in-tray and a cortisone injection during this visit, but Dr. Martija refused to give him either. Thomas Dep., ECF 173-1 at 61. There is no dispute, however, that at the time of his encounter with Dr. Martija, Mr. Thomas was scheduled for an appointment with Dr. Obaisi six days later, on March 26, 2015, and that he received a cortisone injection one day after that, on March 27, 2015.

An inmate's "dissatisfaction with a [medical provider's] prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment is so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Teague v. Hoffman*, No. 18-cv-126-wmc, 2020 U.S. Dist. LEXIS 191173, at *20-21 (W.D. Wis. Oct. 15, 2020) (granting summary judgment in favor of nurse who did not provide a splint, ACE bandage, or brace to treat the plaintiff's leg injury but

5

prescribed ibuprofen, a crutch, activity restrictions, and exercises, noting that the plaintiff offered no evidence that the prescribed treatments were inappropriate) (alterations in original) (citation omitted). At her deposition, Dr. Martija testified that although later medical imaging revealed that her original assessment of bursitis was incorrect, her differential assessment was reasonable based on the information she had at the time of his March 20, 2015, visit. Martija Dep., ECF 171-2 at 55. Mr. Thomas does not offer any evidence to the contrary, nor does he suggest that Dr. Martija's prescribed course of treatment was inappropriate for bursitis. The mere fact that Dr. Martija's bursitis assessment turned out to be mistaken, or that the course of treatment she prescribed did not alleviate Mr. Thomas's symptoms do not, without more, suggest deliberate indifference.

Moreover, Mr. Thomas admits that he returned the crutch Dr. Martija prescribed on April 6, 2015. He explained, "they were telling me that I needed to keep the crutches, but I gave it back because, like I said, I didn't want to be dependent on crutches." Thomas Dep., ECF 173-1 at 26. Having declined to follow the course of treatment Dr. Martija prescribed, Mr. Thomas cannot be heard to complain that her treatment was ineffective. To the extent Mr. Thomas faults Dr. Martija for failing to follow up with him after his March 20, 2015, visit, Dr. Martija testified without contradiction that she knew that Dr. Obaisi would do so less than a week later.

6

According to Mr. Thomas, he again visited Dr. Martija for urgent care on or around May 5, 2015, because his knee was "popping," and that she told him she was seeing patients only for the Asthma Clinic. This visit is not memorialized in Mr. Thomas's medical records. What his records do show, however, is that Mr. Thomas had medical visits with nurses on May 2, 2015, and May 13, 2015, as well as a visit with Dr. Obaisi on May 21, 2015, and that he did not mention his popping knee at any of these visits. Even assuming, then, that Mr. Thomas reported his popping knee to Dr. Martija on May 5, 2015, and that she could have treated that condition during the Asthma Clinic, the notes from Mr. Thomas's other medical visits during this period—the content of which he does not dispute—belies any inference that his knee condition was exacerbated by her failure to do so.

Mr. Thomas describes a final encounter with Dr. Martija in July of 2015, when he claims she refused to authorize a one-day "waist chain" permit for an x-ray he was scheduled to undergo for an unrelated health condition (sarcoidosis). According to Mr. Thomas, Dr. Martija's failure to authorize the waist chain caused the x-ray to be delayed from July to September of 2015. Even taking these facts as true, however, they do not suggest deliberate indifference to Mr. Thomas's degenerative joint disease and osteoarthritis. Setting aside that the x-ray itself was unrelated to these condition, nothing in the record suggests that delaying the x-ray compromised or posed any risk to Mr. Thomas's health, much less that Dr. Martija knew that it

7

did. Indeed, Mr. Thomas does not claim that rescheduling the x-ray had any negative health consequences for him at all.

Dr. Martija, for her part, supports her motion for summary judgment with the opinion of a medical expert, Dr. Nathaniel Evans. Dr. Evans reviewed Mr. Thomas's medical record and opined that Dr. Martija's course of treatment for his joint conditions—and, indeed, the overall care that she provided to Mr. Thomas—was reasonable and consistent with the standard of care. *See* Evans Rep., ECF 171-4 at 10. Mr. Thomas offers no competent evidence to controvert this opinion.

In sum, I conclude that no reasonable jury could infer from the totality of the record that Dr. Martija was deliberately indifferent to Mr. Thomas's degenerative joint disease or his osteoarthritis. Accordingly, she is entitled to summary judgment on his Eighth Amendment claim.

### B. Dr. Obaisi

The central theory of Mr. Thomas's claim against Dr. Obaisi is that by persisting in a course of treatment he knew to be ineffective, and by failing to ensure that Mr. Thomas had knee replacement surgery sooner than in September of 2019, Dr. Obaisi manifested deliberate indifference to his degenerative joint disease and osteoarthritis.[2] While it is true that a medical provider's

---

[2] Although the second amended complaint alleges that Mr. Thomas complained to Dr. Obaisi in 2013 about his placement in a gallery

8

persistence in a course of treatment known to be ineffective can give rise to an inference of deliberate indifference, *Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014), the undisputed record in this case simply does not allow for such an inference. Mr. Thomas's complaint references just a handful of encounters with Dr. Obaisi. He does not dispute, however, that he saw Dr. Obaisi eighteen times between January of 2015 and December of 2017. During this period, Dr. Obaisi ordered x-rays, an MRI, and physical therapy, and prescribed twelve different medications as well as ice, knee sleeves, topical creams, and crutches to investigate and alleviate Mr. Thomas's pain. Like Dr. Martija, Dr. Obaisi initially assessed Mr. Thomas with bursitis. Obaisi L.R. 56.1 Stmt., ECF 198 at ¶ 10. But after assessing him with rheumatoid arthritis in April of 2015, Dr. Obaisi referred Mr. Thomas to a rheumatologist at the University of Illinois-Chicago ("UIC"). *Id*. at ¶¶ 17-19. In December of 2015, Mr. Thomas was seen by Dr. Sarah Vodopest at UIC, who recommended x-rays of his knees, feet, and hands; physical therapy; and a sixty-day follow-up appointment. *Id*. at ¶ 21.

The record shows that Dr. Obaisi followed each of Dr. Vodopest's recommendations: x-rays were taken on January 20, 2016; Mr. Thomas received physical therapy throughout January and February of 2016; and Mr. Thomas was approved for a follow-up appointment at UIC on

---

that required him to climb stairs, Mr. Thomas acknowledges that Dr. Obaisi gave him a low bunk/gallery permit, and that prison administrators were responsible for placing him appropriately.

9

December 24, 2015. Although the follow-up appointment at UIC did not actually occur until May of 2016, there is no evidence that Dr. Obaisi had any influence over the scheduling of that appointment. Accordingly, there is no basis for holding him liable for any damage this delay might have caused. *See Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 966 (7th Cir. 2019) ("nothing in the record suggests that Dr. Obaisi's actions or inaction caused any of the scheduling delays with Walker's appointments at UIC. Such lack of personal involvement saves Dr. Obaisi from liability here.").

The record further indicates that when Mr. Thomas returned to UIC for follow-up in May of 2016, the doctors he saw there recommended: 1) an MRI of his left knee 2) an orthopedic surgery referral; 3) physical therapy; 4) topical creams; 5) the continuation of two medications; and 6) ice. Obaisi L.R. 56. Stmt., ECF 198 at ¶ 32. Again, the record reveals that Dr. Obaisi substantially followed each of these recommendations. Within a week, Dr. Obaisi had requested an MRI and an orthopedic evaluation and had ordered physical therapy. *Id*. at ¶ 34. The recommended creams, medications, and ice were also ordered. *Id*.

Mr. Thomas makes much of the fact that while he received the orthopedic surgery referral in May of 2016, he did not actually undergo knee replacement surgery until September of 2019. But referral for evaluation by an orthopedic surgeon does not necessarily mean that surgery is required imminently. As Dr. Obaisi's expert Dr.

10

Evans explains, patients with osteoarthritis commonly defer or delay total knee replacement surgery on the advice of their doctors, since undergoing a knee replacement at an early age can increase the risk that another knee replacement will be needed later in life. Evans Rep., ECF 173-4 at 9. Mr. Thomas has offered no competent evidence to suggest that notwithstanding this risk, his particular circumstances warranted surgery prior to September of 2019, much less that any competent medical provider would have concluded that they did. Accordingly, even assuming that Dr. Obaisi could have taken steps to ensure that Mr. Thomas had knee surgery sooner than he did, his failure to do so does not amount to deliberate indifference. *See Pyles* 771 F.3d at 409 ("[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances.") (internal quotation marks and citation omitted).

The record is replete with evidence that Dr. Obaisi invoked a number of diagnostic tools and tried a variety of medications and medical devices to investigate and treat Mr. Thomas's joint pain between January of 2015 and his death in December of 2017. Mr. Thomas's view that Dr. Obaisi was deliberately indifferent to his medical conditions is not based on any medical evidence suggesting that Dr. Obaisi's prescribed course of treatment was inappropriate for his conditions, but rather on Mr. Thomas's subjective view of his symptoms and his dissatisfaction with his treatment results. Summary

11

judgment is appropriate under these circumstances. *See id.* ("[d]isagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation.").

### 2. Mr. Baldwin and Mr. Gomez's motion

These defendants' joint motion argues that Mr. Thomas is not entitled to a trial on his Rehabilitation Act claim against them because the record is devoid of evidence from which a jury could reasonably conclude that he was denied a program or service as a result of his disability or that defendants discriminated against him based on his disability. I agree with this read of the evidence.

Mr. Thomas argues that defendants effectively denied him meal service by forcing him to use the stairs to get to meals, rather than providing lay-in-tray service to accommodate his degenerative joint disease and osteoarthritis. One problem with this argument is that nothing in the record suggests that Mr. Thomas requested lay-in-tray service at any point while he was housed in Stateville's upper galleries. In addition, Mr. Thomas admits that he never actually missed a meal due to an inability to navigate the stairs. And while he argues that defendants effectively deprived him of meal service by putting him "at risk of incurring a serious injury" each time he had to take the stairs to eat, the record does not support that characterization. True, Mr. Thomas testified that going up and down

12

the stairs was "taking a toll on his leg," Pl.'s Dep., ECF 173-1 at 46, but if he ever told any prison official that he believed it was dangerous for him to walk up and down the stairs, there is no evidence of it in the record. And while the fall Mr. Thomas took after his leg "gave out" in 2015 suggests that he may have been unsteady on his feet as a result of his disability, by that point Mr. Thomas had long since been moved back to a low gallery and was no longer required to navigate multiple flights of stairs. Accordingly, there is no basis for inferring that defendants required Mr. Thomas to confront an unreasonable risk of injury in order to participate in meals.

Moreover, although the record is sparse concerning Mr. Thomas's gallery placement between sometime in 2012 and September of 2014, it generally indicates that he received all of the accommodations he requested to enable him to participate in prison meals and other activities. By Mr. Thomas's own account, he was moved to a low gallery five days after writing to the Stateville placement officer in September of 2014. Similarly, Mr. Thomas claims that he "first felt the need for crutches" on March 19, 2015, and that he was issued two crutches the following day. And while Mr. Thomas makes the conclusory statement that he "was told his was not working because of his crutch"—an assertion I construe as an argument that he was denied work because of his disability—he offers no specific evidence in this connection, nor does he articulate any cogent theory under which a

13

jury could hold defendants liable under the Rehabilitation Act for the conduct alleged.

At bottom, Mr. Thomas complains that defendants Baldwin and Gomez violated the Rehabilitation Act by failing to ensure that he received an accommodation he never asked for while ignoring undisputed evidence that he swiftly received those that he did. Mr. Thomas is not entitled to try his Rehabilitation Act claim on such a record.

### III.

For the foregoing reasons, defendants' motions for summary judgment are granted.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated: March 6, 2023